In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 25-1782

ROBERT R. RICHARDSON,

*Plaintiff-Appellant,*

*v.*

NORTHWESTERN MEMORIAL HEALTHCARE and CENTRAL
DUPAGE PHYSICIAN GROUP, d/b/a Northwestern Medicine
Regional Medical Group,

*Defendants-Appellees.*

———————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:23-cv-0617 — **Lindsay C. Jenkins**, *Judge.*

———————

ARGUED APRIL 16, 2026 — DECIDED JULY 29, 2026

———————

Before HAMILTON, LEE, and TAIBLESON, *Circuit Judges.*

LEE, *Circuit Judge.* Dr. Robert Richardson was 75 years old
when he was hired as a neurosurgeon for Central DuPage
Physician Group d/b/a Northwestern Medicine Regional
Medical Group ("RMG"). When he was fired three years later,

he sued RMG for age discrimination.[1] The district court granted summary judgment after concluding that no reasonable jury could find in Dr. Richardson's favor. We affirm.

## I. Background

Because Dr. Richardson is challenging the district court's grant of summary judgment, we view all disputed facts and draw all reasonable inferences in his favor. *Gamble v. County of Cook*, 106 F.4th 622, 625 (7th Cir. 2024).

RMG is a medical group working at Northwestern Medicine Central DuPage Hospital ("CDH") and Northwestern Medicine Delnor Hospital ("Delnor"). CDH and Delnor, as Level II trauma centers, require on-call neurosurgeons to independently review any cases requiring urgent evaluation or surgical intervention and to perform any necessary surgeries. RMG neurosurgeons share a call pool so that any neurosurgeon "on call" would typically cover both Delnor and CDH.

In addition to the neurosurgeons, RMG also staffs advanced practice professionals ("APPs") at CDH and Delnor. APPs include advanced nurse practitioners and physician assistants to assist the neurosurgeons. During the relevant period, APPs were paid between $110,000 and $160,000.

Dr. Patrick Towne has been RMG's president since 2014. His duties include hiring and firing RMG neurosurgeons. When making such decisions, he typically consulted Dr. Babak Jahromi and Dr. Andrew Chenelle.

---

[1] Dr. Richardson also sued RMG's parent company, Northwestern Memorial HealthCare ("NMHC"). The district court granted summary judgment in favor of NHMC because it does not qualify as one of Dr. Richardson's employers. Dr. Richardson does not appeal this ruling.

Dr. Richardson is a board-certified neurosurgeon. Prior to his time at RMG, Dr. Richardson worked with Dr. John Brayton in another practice. Around 2017, RMG hired Dr. Brayton, and, at Dr. Brayton's request, RMG hired Dr. Richardson a short time later. Dr. Richardson was 75 years old at the time and earned $180,000, well below what a typical neurosurgeon made at RMG. This was because, to Dr. Towne's understanding, Dr. Richardson was essentially hired to be Dr. Brayton's assistant, similar to an APP. Dr. Richardson reported to Dr. Chenelle, the medical director of neurosurgery. Dr. Chenelle reported to Dr. Jahromi, who in turn reported to Dr. Towne.

RMG's neurosurgeons covered call duties at both Delnor and CDH, but Dr. Richardson worked exclusively at Delnor. The parties dispute the scope of Dr. Richardson's capabilities and whether he could cover call independently and work on his own as the other neurosurgeons did. For now, we will assume he could. It is undisputed, however, that Dr. Jahromi and Dr. Towne believed that Dr. Richardson did not perform operations by himself like RMG's other neurosurgeons, choosing instead to work in an APP-type role.

In 2018, Dr. Jahromi discussed with his colleagues his desire to have neurosurgeons "practice at the top of their license" by independently covering call and performing surgeries, while having APPs perform all supportive tasks. This policy was implemented in piecemeal fashion over the next few years.

To carry out this operational goal, Dr. Towne and Dr. Jahromi had monthly discussions about how to implement an APP-intensive model at CHD and Delnor that would provide the neurosurgeons with more time to maximize their productivity. Furthermore, the resulting increase in neurosurgeon ef-

ficiency, Dr. Towne hoped, would allow RMG to hire more neurosurgeons to lessen physician burn out. To justify a new hire, however, Dr. Towne had to present RMG management with evidence that the current neurosurgeons were working at peak productivity levels.

RMG measured the productivity of its neurosurgeons and other professional staff by using, what it called, Relative Value Units ("RVUs"). RMG assigned different RVU values to the various services and procedures its staff performed; though these RVU amounts vary, the role of a primary surgeon was always associated with higher RVUs than that of an assisting role. A neurosurgeon's financial contribution to RMG was calculated based on the surgeon's anticipated RVU production, the individual's actual RVU production, and the total expenses RMG incurred for employing the surgeon, including salary and malpractice insurance. As compared to surgeons, APPs were typically paid less and did not require malpractice insurance.

On March 18, 2020, at the onset of the COVID-19 pandemic, RMG instructed Dr. Richardson to work from home. In May and July 2020, Dr. Richardson asked for permission to return to work in person, but Dr. Jahromi denied the requests. When denying the July request, Dr. Jahromi told Dr. Richardson that he needed to work from home "because of [his] age and because of the risk of contracting COVID, and if [he] was on a ventilator, [he]'d be a goner." Dkt. 42-2 at 42.[2]

Over time, Dr. Jahromi came to believe that Dr. Richardson's RVUs were much lower than those of other RMG neu-

---

[2] "Dkt." refers to the docket number in the district court record.

rosurgeons. Furthermore, in Dr. Towne's view, an APP at RMG could perform "most" of the duties that Dr. Richardson performed but at much lower costs (by, for example, eliminating the need for malpractice insurance). What is more, because Dr. Richardson was categorized as a neurosurgeon, Dr. Towne believed that his employment lowered the overall productivity of the neurosurgeons, undercutting the case for hiring additional ones.

On September 2, 2020, Dr. Jahromi and Dr. Towne informed Dr. Richardson that his employment was being terminated, effective December 31, 2020. They based the decision, they said, on RMG's growing reliance on APPs and their desire to hire a neurosurgeon to cover call at both CDH and Delnor. RMG hired another neurosurgeon about a year later.

Dr. Richardson filed this suit, alleging that RMG discriminated against him based on his age in violation of the Age Discrimination Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* After discovery, RMG filed a motion for summary judgment, which the district court granted. Dr. Richardson appeals.

## II. Discussion

We review a district court's grant of summary judgment *de novo*. *See REXA, Inc. v. Chester*, 42 F.4th 652, 661–62 (7th Cir. 2022). Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making this determination, we view the evidence and draw all reasonable inferences in the nonmovant's favor. *Gamble*, 106 F.4th at 625.

The ADEA prohibits an employer from terminating or otherwise adversely affecting the employment of an individual

aged 40 and older "because of such individual's age." 29 U.S.C. § 623(a). "To establish an ADEA violation, 'an employee must show that age actually motivated the adverse employment action.'" *Mullin v. Temco Mach., Inc.*, 732 F.3d 772, 776 (7th Cir. 2013) (quoting *Van Antwerp v. City of Peoria*, 627 F.3d 295, 297 (7th Cir. 2010)). In other words, "age must have played a role in the employer's decision-making process and had a determinative influence on the outcome." *Id.* (quoting *Van Antwerp*, 627 F.3d at 297).

To assess a plaintiff's ADEA claim, we consider whether there is any evidence, direct or circumstantial, that shows that he suffered an adverse employment action because of his age. *Murphy v. Caterpillar Inc.*, 140 F.4th 900, 911 (7th Cir. 2025) (citation omitted).[3] To make this showing at summary judgment, the plaintiff can utilize one of two well-trodden paths. First, he can invoke the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this approach, the ADEA plaintiff must make out a *prima facie* case by demonstrating that (1) he is over 40 years old; (2) his work performance met the employer's legitimate expectations; (3) he suffered an adverse employment action;

---

[3] Direct evidence is "evidence which, if believed by the trier of fact, will prove the particular fact in question without reliance on inference or presumption." *Pitasi v. Gartner Grp., Inc.*, 184 F.3d 709, 714 (7th Cir. 1999) (citation modified); *see Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) ("One example of direct evidence would be a management memorandum saying, 'Fire [plaintiff]—he is too old.'"). Circumstantial evidence, on the other hand, proves "discriminatory motive on the part of the employer through a longer chain of inferences." *Van Antwerp*, 627 F.3d at 298 (citation omitted).

and (4) one or more similarly situated individuals forty years old or less received better treatment. *Arnold v. United Airlines, Inc.*, 142 F.4th 460, 469–70 (7th Cir. 2025). If the plaintiff overcomes this hurdle, the burden shifts to the employer to "articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* at 470 (internal citation omitted). If the employer does so, the plaintiff must demonstrate that the stated reason was a pretext for discrimination. *Id.*; *see also Murphy*, 140 F.4th at 914 (discrimination may be inferred if the employer's asserted reasons for taking the action are pretextual, that is, "a lie" or "phony reason for some action.") (citation modified).

Rather than employing the *McDonnell Douglas* framework (or, in addition to it), a plaintiff can take a more "holistic" approach by pointing to all "the evidence in the aggregate" to show an "inference of prohibited discrimination." *Arnold*, 142 F.4th at 469 (internal citation omitted); *see Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016). Such evidence might include, for example, facts that undermine the employer's purported nondiscriminatory justification for the adverse employment action. Here, Dr. Richardson relies primarily on the more "holistic" approach, arguing that discriminatory animus can be inferred from the record as a whole.

Nobody disputes that Dr. Richardson was over 40 years old at the time of his firing or that his firing was an adverse event. Nor do the parties dispute that Dr. Towne and Dr. Jahromi were the relevant decisionmakers. The only issue before us is causation, that is, whether the record contains evidence from which a reasonable jury could find that Dr. Richardson's advanced age *caused* his employment termination.

Before we proceed to the merits, however, the parties dispute whether the ADEA requires age to be a "but-for" cause or the "sole" cause of an adverse employment action. The district court, at times, seemed to rely on the latter standard, but this was incorrect. As the Supreme Court held in *Gross v. FBL Financial Services, Inc.*, to establish a disparate-treatment claim under the ADEA, "a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision." 557 U.S. 167, 177–78 (2009). And a "but-for" cause need not be the sole one. *See Bostock v. Clayton County*, 590 U.S. 644, 656 (2020) ("Often, events have multiple but-for causes."); *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 275 (2d Cir. 2023) ("[I]n addressing a discrimination claim, however, there can be more than one 'but-for' cause of an adverse employment action.") (citation modified). Nevertheless, on this record, even under the correct "but-for" standard, RMG was entitled to summary judgment.

To show that his advanced age was a but-for cause of his firing, Dr. Richardson relies heavily on the way RMG treated him during the early months of the COVID pandemic. He contends, for example, that he was the only person in the neurosurgery department that RMG sent home in March 2020. And when he asked to return in July 2020, Dr. Jahromi told him that he could not return to work on account of his age, even remarking that Dr. Richardson would be a "goner" if he had to be placed on a ventilator.

To start, the record does not support Dr. Richardson's assertion that he was the only RMG neurosurgeon who had to work remotely. In fact, the portion of Dr. Jahromi's deposition that Dr. Richardson cites for this proposition evinces the contrary. When asked about his involvement in the decision to

have Dr. Richardson work from home, Dr. Jahromi responded:

> That was an instruction given to all surgeons at all hospitals. … So part of [Northwestern Medical]'s mandate was to absolutely avoid going to work if necessary. To transition everything we could across all hospitals, all faculty, everyone to remote work wherever we could. We revised call schedules so that people would not interact with each other. … Everything was done with the intent of no one interacting unless they were absolutely needed on site, and even then shifting everything to remote work.

Dkt. 42-5 at 20.

Rather than singling Dr. Richardson out, RMG implemented a general mandate that all personnel should stay at home to the extent possible.

Dr. Richardson is correct, however, that Dr. Jahromi's statements to him in July (at least, as Dr. Richardson recalls them) indicate that his age was a factor in RMG's decision to keep Dr. Richardson at home. Additionally, according to Dr. Brayton, Dr. Chenelle also had remarked that Dr. Richardson should be sent home during the COVID pandemic due to his age.[4]

---

[4] RMG objects to the admission of this testimony on the grounds that Dr. Chenelle's statements (as relayed by Dr. Brayton) constitute inadmissible hearsay. But the district court did not abuse its discretion in finding that Dr. Chenelle was a decisionmaker at RMG and that his statements would qualify as statements of a party opponent under Fed. R. Evid.

RMG downplays the significance of these comments, arguing that the motivating factor was not so much Dr. Richardson's age but his susceptibility to COVID. But at this stage, we must draw all reasonable inferences in favor of Dr. Richardson and, so doing, assume that age was a consideration in RMG's decision to keep him from returning to work in July.

Where Dr. Richardson's claim falters, however, is in connecting Dr. Jahromi's statements in July to his announced termination on September 2, 2020. As the district court put it, "[w]hy" Dr. Richardson "was sent home during Covid is unrelated to and does not undermine [Dr. Towne's] separate business justification" for ending Dr. Richardson's employment. *Richardson v. Nw. Mem'l HealthCare*, 23-cv-617, 2025 WL 1114398, at *8 (N.D. Ill. Apr. 15, 2025). A close examination of the record supports this conclusion.

Dr. Jahromi made his comments on July 4, 2020 (which also post-dates Dr. Chenelle's statement to Dr. Brayton). And, because the record does not indicate when RMG decided to fire Dr. Richardson, we are left with September 2, 2020, as the best approximation of the date the decision was made.

Even if this span of sixty days were enough to constitute "suspicious timing," as Dr. Richardson contends, it is not enough to create an inference of discrimination on its own. *See Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012) ("Suspicious timing will rarely be sufficient in and of itself to create a triable issue.") (citation modified). Consider *Pugh v. City of Attica*, 259 F.3d 619 (7th Cir. 2001). In that case, Pugh worked as

---

801(d)(2). *United States v. Schalk*, 515 F.3d 768, 774 (7th Cir. 2008) (explaining that we review hearsay rulings for abuse of discretion) (citation omitted).

an animal control officer for Attica. Based on various events in 1994 and 1997, the city began to suspect that Pugh suffered from alcohol dependence and required him to undergo counseling and regular testing. In March 1998, Pugh was stopped by police and given a breathalyzer test. In response, Pugh retained an attorney who contacted the city in April 1998, claiming that it was violating Pugh's constitutional rights.

Around the same time, the police began to investigate Pugh for allegedly misappropriating public funds. Concluding he had done so, the city terminated Pugh's employment in May 1998. Pugh then sued the city, alleging among other things that the city had fired him due to his alcoholism in violation of the ADA. In support, he argued that the city's stated justification was pretextual, pointing to the short time between his attorney's communication with the city and his subsequent firing. On appeal, we affirmed the district court's entry of summary judgment against Pugh, noting that the "suspicious timing of Mr. Pugh's discharge is only sufficient to demonstrate a showing of pretext if Mr. Pugh also presents other evidence that casts doubt on the veracity of the City's belief that Mr. Pugh had mishandled funds." *Id.* at 629.

Just so here, Dr. Richardson argues that RMG's stated reasons for terminating his employment were fabrications and cites to Dr. Jahromi's and Dr. Towne's statements at the beginning of the COVID pandemic to support this argument. The problem is that he offers nothing else. *See Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 919 (7th Cir. 2000) (holding that a three-month gap between filing of EEOC charges and firing not sufficient to create inference of discrimination to support retaliation claim); *Sweet v. Towne of Bargersville*, 18 F.4th 273, 279 (7th Cir. 2021) (noting that "a three-month gap [is] still too

long to support an inference of retaliatory motive" absent any other evidence).

For its part, RMG contends that it had a nondiscriminatory reason for terminating his employment—it was trying to implement a staffing model that relied more heavily on APPs, thus allowing its neurosurgeons to become more productive and increase revenue. In its view, because Dr. Richardson's role was more akin to that of an APP, his productivity was significantly lower than that of other neurosurgeons and inconsistent with the new business model.

In support, RMG cites to Dr. Jahromi's testimony that Dr. Richardson's RVUs were much lower than the RVUs of other neurosurgeons in the group. Moreover, according to Dr. Towne, employing Dr. Richardson cost RMG significantly more than employing an APP, who could perform substantially similar duties without incurring the expense of malpractice insurance. As a result, Dr. Towne, who wanted to add another neurosurgeon, believed that Dr. Richardson lowered the overall profitability of RMG's neurosurgeons, making it difficult to justify hiring more.

In response, Dr. Richardson argues that the understandings Dr. Jahromi and Dr. Towne had of his capabilities and role were incorrect. But Dr. Richardson must do more than show that their beliefs about him were wrong; he must offer proof from which a reasonable jury could conclude that RMG's stated reasons for his termination were lies or deceits to cover up intentional age discrimination. Dr. Richardson offers no such proof here.

To the contrary, the evidence in the record indicates that Dr. Towne and Dr. Jahromi in fact believed that Dr. Richard-

son was not able to work as a fully-fledged neurosurgeon. According to Dr. Towne, Dr. Brayton told him that "Dr. Richardson did a good job … but he was limited in his scope of ability." Dkt. 42-6 at 20. "Dr. Brayton made it clear to me," Dr. Towne added, "that Dr. Richardson did a good job in the operating room as his surgical assistant" but that "he was limited in his scope of ability to where he cannot take call or cover the hospital by himself." *Id.* Similarly, Dr. Jahromi came to understand that Dr. Richardson's practice "was limited in scope" based on his conversations with Dr. Brayton, Dr. Richardson, and others "who covered call at Delnor Hospital." Dkt. 42-5 at 12.[5] And it is undisputed that Dr. Richardson only covered call at Delnor and not CDH.

Undeterred, Dr. Richardson argues that Dr. Jahromi and Dr. Towne should have spoken to him directly rather than relying on the accounts of others. Perhaps this would have been the better course, but a poorly considered decision, even one based on inaccurate information, does not create alone an inference of discrimination. *See Everett v. Cook County*, 655 F.3d 723, 730 (7th Cir. 2011) ("The fact that a decision was poorly considered is not enough to establish pretext."); *Murphy*, 140 F.4th at 915 ("Our focus is not on the wisdom of the decision to take adverse employment action but on its genuineness.") (citation modified).

Additionally, Dr. Richardson points to his employment agreement that required him to remain board certified. In his

---

[5] Dr. Richardson objects to these statements as hearsay, but they are being offered to show Dr. Jahromi's and Dr. Towne's state of mind rather than for their truth. *See* Fed. R. Evid. 801.

view, this supports his theory that he was able to perform the same tasks as the other neurosurgeons in the group, undercutting RMG's reasons for firing him. But this says nothing about what services he actually provided at RMG. And the undisputed evidence shows that Dr. Jahromi and Dr. Towne in fact believed that Dr. Richardson was not performing the same tasks as his physician colleagues. Indeed, Dr. Richardson's salary of approximately $180,000, which was well below that of other RMG neurosurgeons, supports the more limited nature of his role. Thus, even if Dr. Towne and Dr. Jahromi were mistaken about Dr. Richardson's capabilities, the record contains no evidence they were being dishonest in their belief. *Kidwell*, 679 F.3d at 969 ("[W]e look for pretext in the form of 'a dishonest explanation, a lie rather than an oddity or an error.'") (quoting *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000)).

Finally, Dr. Richardson argues that, if RMG had been dissatisfied with his performance, it had the obligation under his employment agreement to confer with him to address and resolve such concerns. Not following these procedures, he contends, is evidence of discrimination. But the "opportunity to cure" provision in Dr. Richardson's employment contract applied only to terminations for cause. Dkt. 42-3 at 6. A termination without cause (which is what happened here, Dkt. 42-4 at 2) only required at least ninety days' notice, which Dr. Richardson received.

*         *         *

For these reasons, we AFFIRM the district court's grant of summary judgment.